Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7738 | **DATE** | 9/6/2001 |
| **CASE TITLE** | LARRY E. CARTER vs. CHICAGO TRANSIT AUTHORITY, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER: the CTA's motion for judgment notwithstanding the verdict is denied. The defendant's motion for new trial concerning liability is denied. However, the court hereby grants the motion for a new trial on the issue of damages only unless, within 21 days of the date hereof Plaintiff files a remittitur in the amount of $200,000.00 thereby agreeing to accept a reduced award of $100,000. The totality of the circumstances supports a compensatory damage award of no more than $100,000. Finally, Plaintiff's motion for injunctive relief is denied.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 0 7 2001 | |
| | Notified counsel by telephone. | | date docketed | 54 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING | | |
| | | 01 SEP -7 AM 8:45 | date mailed notice | |
| TBK | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LARRY E. CARTER, ) | |
| ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 99 C 7738 |
| v. ) | Judge Ronald A. Guzman |
| ) | |
| ) | |
| CHICAGO TRANSIT AUTHORITY, ) | |
| BOB CAGALA, and JIM CHRISTIANSON ) | **DOCKETED** |
| ) | SEP 0 7 2001 |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Following a jury trial, Defendant Chicago Transit Authority filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59, or for remittitur of the damages. Plaintiff filed a motion for injunctive relief. For the following reasons, Defendant's motion for judgment notwithstanding the verdict, or in the alternative, for a new trial is denied. Defendants' motion for a remittitur of damages is hereby granted. Plaintiff's motion for injunctive relief is denied.

## BACKGROUND FACTS

Plaintiff Larry Carter ("Carter") filed an amended complaint against Defendants, the Chicago Transit Authority, Bob Cagala, and Jim Christianson ("CTA, Cagala, or Christianson")

1

alleging violations of Title VII, 42 U.S.C. § 2000e et seq. for requiring Carter to work in a hostile working environment due to race and color discrimination. Carter was hired by the CTA on February 20, 1995, and he was assigned to CTA's Heating, Ventilating and Air Conditioning Department. Carter remains employed by the CTA. This case was tried before a jury. The jury returned a verdict in favor of Carter finding that the Defendants had discriminated against Carter and subjected him to a racially hostile work environment. The court entered judgement in favor of Carter and damages in the amount of $300,000 were awarded.

## DISCUSSION

Federal Rules of Civil Procedure 50(b) and 59(a) governs the CTA's motion notwithstanding the verdict or in the alternative for a new trial. Rule 50(b), provides in part, that the movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment and may alternatively request a new trial or join a motion for trial under Rule 59. Under Rule 59(a), "A new trial may be granted as to all or any of the parties on all or any of the issues (1) in any action in which there has been a trail by jury, for any of the reasons for which trials have heretofore been granted in actions at law in the courts of the United States." A request for a new trial based on the sufficiency of the evidence is granted only if the verdict is against the manifest weight of the evidence. *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F. 3d 1058, 1062 (7th Cir. 2001). A jury verdict will not be set aside if there exists a reasonable basis in the record to support the verdict. *Id.*

On a motion for judgment as a matter of law, this court reviews whether "the evidence represented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the

2

motion is directed." *Mathur v. Bd. of Trustees of S. Illinois Univ.*, 207 F. 3d 938, 941 (7th Cir. 2000). In assessing the CTA's motion for judgment as a matter of law, the court will apply a stringent standard in reviewing the jury's verdict. *Christie v. Foremost Insur. Co.*, 785 F. 2d 584, 586 (7th Cir. 1986). If a rational jury could have found for the plaintiff, then the court will uphold the verdict. *Mathur,* 207 F. 3d at 941. The court may "not step in and substitute its view of the contested evidence for the jury's. *Id.* The court, at this juncture, asks simply whether the jury's verdict could be sustained on the record as a whole. *Id.* The Seventh Circuit has noted that "even a thin case may stand on our deferential review of a jury's verdict." *Price v. Marshall Erdman & Assoc.,* 966 F. 2d 320, 322 (7th Cir. 1992).

In support of its motion for a new trial the CTA puts forth six arguments. First, the CTA argues that the evidence of racial harassment does not establish on an objective and subjective basis the harassment Carter was subjected to was so severe as to create a hostile work environment. Second, the CTA argues that once brought to management's attention, prompt action was taken by the Defendants. Third, the CTA argues that a new trial must be granted because the Court erred in denying the CTA's motion for mistrial at the close of Carter's case on the basis that it was extremely prejudicial for plaintiff to make references to the Ku Klux Klan. Next, Defendants argue that the court erred in denying the CTA's proposed jury instruction no. 13 on the issue of second hand harassment. Fifth, Defendant argues that the court erred in overruling the CTA's objection during Carter's closing argument when plaintiff's counsel asked the jury to place themselves in the position of the plaintiff. Finally, the CTA argues that the jury verdict of $300,000 was clearly excessive and a remittitur or a new trial should be ordered. Each of these arguments will be addressed in turn.

# HOSTILE WORK ENVIRONMENT

The law against discrimination in the workplace is well settled. Title VII provides that it "shall be an unlawful employment practice for an employer...to fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race..." 42 U.S.C. § 2000e-2(a)(1). An employer may be liable for discrimination within the meaning of Title VII if an employee is subject to a hostile work environment based on his race. To recover, an employee must show that: 1) he was subject to unwelcome harassment; 2) the harassment was based on his race; 3) the harassment was severe and pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and 4) there is a basis for employer liability. *See Parkins v. Civil Constructors of Ill., Inc.*, 163 F. 3d 1027, 1032 (7th Cir. 1998). The employer is essentially strictly liable if the employee's supervisor created the hostile work environment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 2270, 141 L. Ed. 2 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998).

A work environment is "abusive" when harassment has reached a certain qualitative level that is "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment." *Meritor*, 477 U.S. at 67, 106 S. Ct. 2399 (internal quotation marks omitted). To decide whether conduct rises to this level, "the trier of fact must determine the existence of sexual harassment in light of the record as a whole and the totality of [the] circumstances." *Meritor*, 477 U.S. at 69, 106 S.Ct.2399, 91 L.Ed.2d. 49 (1986) (internal quotation marks omitted). Within the totality of the circumstances are "the quantity, frequency, and severity of

4

the incidents..... factors [that] must be considered cumulatively, so that we may obtain a realistic view of the work environment." *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d. 426, 437 (2d Cir. 1999) (internal quotation marks and citations omitted). The focus of this inquire, therefore, is "the nature of the environment itself." *Perry v. Ethan Allen, Inc.,* 115 F.3d. 143, 150 (2d Cir. 1997); See also *Williams v. General Motors Corp.,* 187 F.3d. 553, 563 (6th Cir. 1999) ("[T]he totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation. This totality-of-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action.").

To establish the existence of a hostile work environment, the plaintiff must show both that the environment was objectively hostile and that the plaintiff subjectively perceived it to be hostile:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment –an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris,* 510 U.S. at 21-22, 114 S. Ct. 367.

The employer is liable for a hostile work environment created by the employee's coworkers, however, only when the employee shows that his employer has "been negligent either in discovering or remedying the harassment." *Parkins,* 163 F. 3d at 1032. Whereas, other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile

work environment claim analyzes a workplace environment as a whole to discover whether it is "abusive." *Harris v. Forklift*, 510 U.S. 17, 22, 114 S. Ct. 367, 126 L .Ed.2d. 295 (1993); *see also Meritor* 477 U.S. 57, 64, 106 S. Ct.2399, 91 L .Ed.2d 49 (1986) (relying on congressional intent to "strike at the entire spectrum of disparate treatment of men and women in employment" in permitting Title VII claims to challenge a discriminatory Hostile work environment).

The CTA, citing *McPaul v. Board of Commissioners of Madison Co.*, 226 F. 3d 558, 567 (7th Cir. 2000) argues from an objective standpoint that the evidence presented at trial is insufficient to create a hostile work environment. The essence of the objective standard is that a reasonable person would find the discriminatory acts to alter the conditions of their employment and to create an abusive working relationship. The CTA claims that the only evidence of any racially related remarks directed at Carter was when Carter was allegedly called "boy" by co-worker Fred Pitner on Carter's first day of work in February 1995, and in June 1999, when Pitner commented about Plaintiff while Plaintiff worked on a roof at the 75th Street Garage. The only other racially related remarks that Plaintiff heard, the CTA contends were: (1) on unidentified dates Plaintiff claims to have overheard remarks from unidentified persons while standing by his truck and (2) comments by Pitner after November, 1999 calling Jesse Jackson a racial epithet. These four incidents, the CTA argues, comprise the entire basis for Carter's claim of his hostile work environment.

Viewing the evidence in its totality, we conclude that there was sufficient proof for a reasonable jury to find that Carter's abuse was severe and pervasive enough as to constitute a hostile work environment in violation of Title VII. The CTA misconstrues the evidence as being isolated because Carter was not able to specify the dates and times of the racially offensive comments and

conduct.

It is undisputed that Carter found his work environment racially hostile from a subjective standpoint because the evidence revealed that Carter complained about the racially offensive comments, he had to remove himself from areas where these comments were being made, complained to supervisors about these racially offensive comments, and was negatively affected by these comments. From an objective standpoint the evidence was also overwhelming that a hostile work environment existed for the plaintiff. Carter testified that he heard many racist remarks against African-Americans over a period of approximately six years in the break room where his co-workers met, in the truck he drove to CTA job sites in and when socializing with coworkers. Carter's deposition was read into evidence where Carter testified that there were so many incidents of racial remarks that the dates were difficult to place.

For example Carter testified that Pitner called Carter "boy" from the first day of Carter's employment (TR. 565, Lines 11-16), Pitner used the "N" word in connection with sports events (TR. 565, Lines 21-22), Carter refused to have coffee in the back because of this language (TR. 566, Lines 1-12), Jesse Jackson was referred to as a "dumb nigger" in front of Carter (TR.566,-568), Pitner's use of the word in reference to Carter was an everyday event (TR. 568, Line 23), while the Ryan Harris murder was discussed Pitner stated [t]hese "niggers" are guilty (TR. 571, Lines 23-24), Pitner told others Carter lived in a ghetto (TR. 573, line 16), Pitner did not watch sports because there are too many "niggers" (TR. 574, Line 4), Pitner stated that is what they do to "niggers" in the South (TR. 575, Lines 2-3), all they can do is "push a mop, push a broom or drive a bus" (TR. 576, Lines 17-18), Pitner rubbed his head into a female African-American's breast (TR. 580, Line 20), Carter was told to sweep the floor (TR. 581, Lines 24-25), Pitner referred African-Americans as

7

"monkeys" (TR. 599, Line 5), racial slurs were made in reference to Mexicans (TR. 599 600–601), Mexicans were referred to as "wet backs" (TR. 601 Line 22) and other such comments and conduct. These incidents took place over a period of approximately 5-6 years and were continuous. Obviously, a reasonable jury could find that this conduct altered the conditions of Carters' work environment.

Carter's testimony was corroborated by coworkers. Marvin Barborek testified that Pitner used the "N" word and "boy" every other day with adjectives such as dumb, stupid, and the "f----" or "f----ing" word. Barborek filed a grievance which mentioned Pitner's frequent use of the "N" word and that Pitner used slurs against the Polish and people of Jewish faith. After Barborek's transfer to the pipefitters from the HVAC group, Pitner continued to harass Barborek when Pitner was at the North Park Garage by using the phrase "niggers, pollack and Jews" to Barborek's face. Pitner did this because he knew not only that Barborek is descended from Polish ancestors, but also because Barborek chose to marry a women of the Jewish faith. Pitner knew that the racial, national origin and anti-Semitic harassment would be particularly offensive to Barborek and made a special effort to make the offensive remarks to Barborek while Pitner was on the job at the North Park Garage. James Christianson, a co-worker and supervisor, admitted using the term "wetback" and "my Mexican" in reference to Raphael Ruiz and "boy" in reference to Carter (TR at 111, lines 10-25). In the West shop a welder showed his Ku Klux Klan card around . (TR at 171, lines 5-14).

The CTA argues that the entire testimony of Marvin Baborek merely establishes that certain CTA employees had a propensity to use certain language. The CTA is wrong. The actions and statements of coworkers also can be relevant ... on the issue of whether the harassment was pervasive. *Mason v. Southern Illinois University at Carbondale*, 233 F. 3d 1036, 1048 (7th Cir.

2000). This is what the Plaintiff was offering the evidence to prove. The fact that Barborek and Carter never worked at the same location at the same time indicates, as Carter has argued, that the racially hostile work environment was prevalent through the CTA's various locations.

Moreover, the evidence further revealed that as victims in common of the racial and anti-semitic harassment of Pitner, Carter and Barborek regularly shared their war stories about the CTA's hostile working environment. Raphael Ruiz testified that racial comments were made by CTA employees everyday (TR. 235, lines17-24). He further testified that Pitner had made a derogatory drawing of a Mexican held up by refrigerant gauges on a napkin, and that Pitner had commented that there was a drawing with reference to Larry Carter hanging by a noose from a tree. (TR p. 238, lines 9-25). Ruiz told Carter about the napkin. (TR. P. 239, lines 1-2).

Co-worker Raphael Ruiz testified that Fred Pitner and Rich McCrae used the "N" word, "boy," "wet back," and "my Puerto Rican" frequently in a loud an boisterous manner that could be heard outside the area where the HVAC workers met in the morning for coffee before obtaining their work assignments. Ruiz testified that he told Carter about the use of the "N"word and "wet back". References to Ruiz's Mexican heritage bothered Ruiz and questions such as "what are you going to do for the holidays--Put up plexiglass were asked (TR. 257, lines 9-12). Ruiz complained to Carter about these comments and Carter would respond "you have to be strong." (TR. 257, lines10-17).

Co-worker Ricardo Melendez also testified to the frequent use of the "N" word in the shop by Fred Pitner and Rich McRae. Melendez said that the conversations were loud enough to be heard outside the room where the discussions were being held. Bob Bickel admitted that Pitner used the "N" word. Fred Seabrooks, a former leader in the HVAC department, testified that Pitner use the "N" word. Seabrooks, an African American, testified that a foreman in the West Shop had showed

9

him his Ku Klux Klan identification card. Pitner himself admitting to using the "N" word. While Carter was sweeping, Pitner exclaims to passerby "look at my boy sweeping the floor." There is other evidence in the record but we need not describe every incident. Obviously, the racial comments and conduct Carter was subjected to were in fact severe and pervasive.

There was also ample evidence in the record that Defendants knew of this racially offensive conduct and did nothing to stop it. The CTA's EEO group in charge of investigating this harassment had no record of Carter's grievance despite the fact that the grievance had undisputedly been sent to six employees of the CTA with the rank of foreman or above. It is beyond question that Rich McRae and Jim Christianson were at the meeting regarding Carter's racial complaints in 1999. Christianson testified that Carter complained that "he had been called a nigger, that someone told him he lived in a ghetto... and he was angry." (Christianson at TR. 17). Christianson further testified that Carter stated " that he did not have to humble himself to these remarks." (TR at 18, lines 2-3). Manager Bob Burns testified that McRae and Christianson both testified that they had never heard Pitner use the "N" word and Pitner denied using the "N"word to Burns. Burns then chose to believe McRae, Christianson and Pitner and Carter's charge of racial harassment was dropped by the CTA.

Defendants point to this conflicting testimony as the basis for a new trial but Barborek, Melendez and Ruiz testified that they heard Pitner use the "N" word in front of Christianson many times. Melendez and Ruiz testified that they heard Pitner use the "N" word in front of McRae many times. The jury apparently chose to believe Barborek, Melendez and Ruiz and this is the job the jury was impaneled to do. Based on the totality of the circumstances discussed above as well as other evidence adduced at trial, we find that the evidence was legally sufficient for a reasonable jury to

find that Carter was subjected to a hostile work environment because he was an African American.

## PROMPT ACTION WAS NOT TAKEN BY THE CTA REGARDING THE COMPLAINTS OF OFFENDING COMMENTS AND CONDUCT

The CTA's second argument contends that the CTA acted promptly once it was made aware of Carter's claim of racial harassment. Employers have an "affirmative obligation" to prevent civil rights violations in the workplace. *Faragher v. City of Boca Raton,* 524 U.S.775, 806 (1998). "[T] combined knowledge and inaction may be seen as ...the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively at the employer's policy." *Id.,* 524 U.S. at 789, 118 S. Ct. 2275. The CTA claims that Carter never filed a complaint with the CTA's affirmative action department and that once Carter complained on June 16, 1999, Mr. Burns spoke with the HVAC foreman concerning the CTA's commitment to have a workplace free of illegal discrimination.

The evidence adduced at trial paints a different picture. Supervisors such as Cagala and Christianson were made aware of the abusive pattern of racial slurs and jokes that Carter was subjected to (TR. 591-1-22) but these complaints were not investigated nor was corrective action taken. In 1996, Carter complained to foreman and coworkers (TR. P.693 Line 9). In 1997, Carter made complaints to Jim Christianson that Pitner has used ethnic and racial terms as well as the foreman. (TR. P. 691-692, Lines 16-25). Carter also raised the issue of racial remarks to a CTA Vice President (TR. 590, Lines 22-23). Nothing was done.

Furthermore, during the investigation of Carter's July 1999 complaint when Carter claimed

11

he was called a "nigger" and identified Pitner as the offending co-worker Manager Bob Burns investigated the complaint by asking Christianson and McRae whether they had ever heard Pitner use the "N" word. (TR. 401, Line 4). Both said no. There was substantial testimony that not only did Pitner use the "N" word, but that McRae and Christianson heard the "N" word from Pitner. (TR. P. 410-412). Furthermore, the record of Barborek's grievance was not in Pitner's file jacket (TR. P. 483) and even as of the trial date, there was no indication of any racial harassment allegations in Pitner's file jacket. (TR. 484). Barborek's grievance only appeared in <u>his</u> personnel file, not Pitner's and Carter's complaint was <u>not</u> copied in Pitner's file. Finally, it was not until trial that this affirmative defense was even raised by the CTA and this court denied this proposed amendment at trial based upon timeliness and the fact that Carter had now been effectively denied the opportunity to obtain discovery of the CTA's complaint procedure and affirmative defense.

## REFERENCE TO THE KU KLUX KLAN AT TRIAL CANNOT BE CONCLUDED TO BE SO PREJUDICIAL THAT A NEW TRIAL IS WARRANTED

The CTA's third argument in support of their request for a new trial contends that the court erred by denying the CTA's motion for mistrial based upon Carter's references to the Ku Klux Klan in his opening statement. The CTA argues that this statement gave the prejudicial impression that there was evidence of the presence of the Ku Klux Klan in this case. The CTA points out that here, there was no incidents concerning Carter and the Ku Klux Klan and thus a new trial is warranted. We disagree. Improper remarks made during a closing argument warrant reversal of the judgment only if the remarks "influenced the jury in such a way that substantial prejudice resulted to the opposing party. *Gruca v. Aplha Therapeutic Corp.*, 51 F. 3d 638, 644 (7th Cir. 1995). It is

undisputed that this court advised the jury that neither the opening statements nor closing arguments are evidence and that any statements or arguments made by the attorneys which is not based on the evidence should be disregarded.

Furthermore, it cannot be concluded that this remark was unconnected to the evidence because it is undisputed that during the trial Seabrooks testified as to seeing a KKK card from the wallet of a CTA foreman in the CTA's west shop. Moreover, even if it could be concluded that the jury considered this statement as evidence, to justify a new trial, an evidentiary error must affect a litigants's substantial rights; that is, a substantial change must exists that such errors affected the outcome of the trail. *Van Stan v. Fancy Colours & Co.*, 125 F. 3d 563, 570 (7th Cir. 1997). The CTA has demonstrated absolutely no prejudice from this remark and thus a new trial is not warranted. The reference to the Ku Klux Klan taken along with Seabrooks testimony, even when taken together, cannot be concluded to have affected the outcome of the trial.

## THE COURT DID NOT ERR AS TO JURY INSTRUCTION #13

Next, the CTA argues that this court erred in overruling its objections to proposed jury instruction #13 which dealt with the subject of second hand harassment. The CTA argues that the failure to give this instruction constitutes error because it allowed the jury to improperly weigh the evidence. We disagree. The court's analysis is limited to determining whether the jury instructions, "as a whole, were sufficient to inform the jury correctly of the applicable law." *Patel v. Gayes*, 984 F. 2d 214, 218-219 (7th Cir. 1993). An incorrect jury instruction warrants a new trial if "considering all the instructions, the evidence and the argument that the jury hears, it appears that the jury was misled or did not have a sufficient understanding of the issued and its duty to determine them." *Gruca v. Alpha Therapeutic Corp.*, 51 F. 3d 638, 644 (7th Cir. 1995). The complaining party, in

seeking a new trial, must demonstrate that the jury's confusion resulted in prejudice. *Id.*

First, there is no evidence of confusion on the juror's part. Second, the CTA's argument ignores jury instruction number 2 which clearly required the following: 1) "[h]e Carter was the subject of unwelcome harassment in the workplace; 2) the harassment was because of his race or color; and 3) that the harassment was so severe or pervasive so as to alter the conditions of his employment and create a hostile or abusive working environment." This instruction clearly spoke to Carter's harassment, race or color, not the harassment, race or color of others. Instruction #2 required that the harassment by co-workers be against Carter and that the harassment be because of Carter's race. The key phrases found in jury instruction #2 "[h]e" meaning Carter, and "his race or color" meaning Carter's race and color, are used consistently with the ordinary usage of the English Language and are not subject to confusion. The jury need not be told that harassment against someone else was not harassment against Carter. Those inferences and understanding are such a basic part of the English language, based on the jury instruction given, that no further instruction need be required. Furthermore, the CTA agreed with instruction #2.

## ASKING THE JURY TO STAND IN THE PLACE OF PLAINTIFF

The CTA claims that plaintiff's closing remarks entitle the CTA to a new trial because the plaintiff twice asked the jury "[w]hat would you have done if it was you?" The CTA offers absolutely no case law in support of why such remarks entitle it to a new jury nor does this statement ask the jury to permit sympathy. In the context of the argument this comment merely referred to what the average person would have done.

## THE VERDICT WAS EXCESSIVE

Finally, the CTA seeks a remittitur of the damage award. They argue that the amount of

14

damages awarded to Carter were excessive and against the weight of the evidence. Unless the amount of the jury's award is "monstrously excessive" or bears no rational connection to the evidence, the court will not disturb the jury's damage calculation. *Cygnar v. City of Chicago,* 865 F. 2d 827, 847 (7th Cir. 1989). The court must accord substantial deference to a jury's determination of compensatory damages. *Ramsey v. American Air Filter Co., Inc.,* 772 F. 2d 1303, 1313 (7th Cir. 1985). To succeed with a motion for a new trial on damages, a plaintiff must show there is no rational connection between the award and the evidence. *Bruso v. united Airlines, Inc.* 239 F. 3d 848, 856 (7th Cir. 2001). The Supreme Court has held that a compensable injury in a hostile work environment claim need not rise to the level of affecting the psychological well-being of the victim, but there must be proof or some mental distress. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

This Court is unwilling to speculate about the nature of the juror's deliberations. The jury was alert and attentive at trial. The statutory limit is $300,000 per plaintiff. 42 U.S.C. §1981a(b)(3)(D). However, the award of $300,000 is excessive in light of the minimal evidence developed at trial regarding Carter's damages. In the instant case it is undisputed that Carter was emotionally affected by his work environment. Carter chose to remove himself from his coworkers, (TR. 603, Lines 12-13) to the extent he could, to avoid hearing and dealing with the race based comments and conduct (Id.). Carter's coworker testified that it negatively affected Carter. It is also undisputed, however, that Carter rarely missed work and there is no evidence in the record developing any facts relevant to physical conditions Carter developed as a result of being subjected to the hostile conduct nor is there evidence developed as to any intangible harms, such as headaches, emotional distress, sleeplessness, marital difficulties, depression, etc. In light of this lack of

evidence an award of $300,000 in damages is clearly excessive.

Reference to other jury verdicts supports this conclusion. Recently, in *Gentry v. Export Packaging Comp.*, 238 F. 3d 842, 844 (7th Cir. 2001) the plaintiff, who was subjected to a sexually hostile work environment over a one year period, was awarded $10,000 in compensatory damages. In *Conner v. Schrader-Bridgeport International, Inc.*, 227 F. 3d 179 (4th Cir. 2000) compensatory damages in the amount of $20,000 were found reasonable in a sexually hostile work environment where the plaintiff was subjected to verbal disparagement, forced display of body parts, failure to investigate her disparate treatment claims, and other hostile conduct. *Id.* In *Slayton v. Ohio Dept. of Youth Services*, 206 F. 3d 669 (6th Cir. 2000) the plaintiff was awarded $125,000 on her hostile environment claim and reinstated to her position. In *Miller v. Rockford Register Star*, $100,000 in compensatory damages to plaintiff where defendant had repeatedly subjected here to sexual jokes, physically grabbed her, caused humiliation and other stress. 2001 WL 637575 at *2 (N.D. Il. 2001)(Judge Reinhard). In *Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F. 2d 1417 (7th Cir. 1986), a Title VII discrimination and retaliation case, the court held that a $25,000 award for the humiliation and stress that plaintiff suffered as a result of the defendant's and retaliatory actions was not "grossly excessive." *Id.* at 1425. The evidence established that the treatment which the plaintiff was subjected to was indeed harsh. The evidence established that the defendants "would place a glue-like substance on the lock of his tool box, hide plaintiff's tools; sabotaged the engines he was supposed to test, racial graffiti blossomed on the walls of the bathroom and on a company bulletin, comments such as the "KKK is not dead", "nigger," and open season on "coons," a hangman's noose covered with a black oily substance was found attached to a black worker's equipment. *Id* at 1420. In *U.S.E.E.O.C. v. AIC Security Investigations, Ltd.*, 55 F. 3d 1276 (7th Cir. 1995), the plaintiff who

was terminally ill prevailed on his American with Disabilities claim and the Court of Appeals upheld a $50,000 award for emotional injuries. The court noted that the plaintiff was dying of cancer and must have suffered a great emotional burden because as a result of the defendants' sanctions he was forced to watch his family suffer emotionally, as well as financially. *Id at* 1286. In *Littlefield v. McGuffey,* 954 F. 2d 1337 (7th Cir. 1992), the defendant was found liable for housing discrimination based on the race of plaintiff's boyfriend and their child. *Id.* at 1341. The Defendant changed the locks, placed plaintiff's belongings out on the porch, called the plaintiff mimicking a stereotypical black manner of speaking, told her he wanted to move in with her and six black guys, called her sister, told her that he was member of the Ku Klux Klan, and asked her how her sister "could have [gone] to bed with a nigger and how she could...have a nigger baby." *Id.* The defendant also left a note threatening the life of plaintiff's boyfriend. *Id.* The Court of Appeals upheld an award of $50,000. In *Ramsey v. American Air Filter Co., Inc.* 772 F. 2d 1303, 1313-14 (7th Cir. 1985) the appellate court ordered a new trial unless the plaintiff accepted a remittitur reducing a $75,000 award to $35,000. In this case, "there was a paucity of reference to any emotional harm that plaintiff suffered as a result of defendant's discrimination. *Id.* In *Cygnar v. City of Chicago,* 865 F. 2d 827 (7th Cir. 1989) the verdict was reduced from $55,000 to $15,000 for emotional distress damages in a discrimination case, *Edwards v. Flagstar Bank* 109 F.Supp.691 (E.D. Mich. 2000). The conduct complained of in the above cases, for the most part, is more severe than the harassing conduct Carter was subjected to. To be sure, the racially harassing conduct was continuous but $300,000 is excessive in light of the evidence.

## **INJUNCTIVE RELIEF**

District judges have wide discretion to issue injunctions in Title VII cases in order to fashion complete remedies and to make whole the victims of employment discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975); EEOC v. Gurnee Inn, Corp., 914 F.2d 815, 817 (7th Cir.1990). In *EEOC v. Gurnee Inn, Corp.* the Defendant had neither an anti- discrimination policy nor a grievance procedure through which employees could complain of sexual harasstoment; it is to these deficiencies that the injunctive relief was addressed. Based on its conclusion that Gurnee had violated Title VII, the district court, over Gurnee's objection to injunctive relief, prohibited Gurnee from engaging in future

discrimination and ordered Gurnee to adopt both a policy banning sexual harassment and a procedure to enforce that policy. The determination in *EEOC v. Gurnee Inn, Corp.* was based upon the testimony of eleven female former Gurnee employees who testified at trial that Defendant Tinsley had engaged in a pattern of sexual harassment that spanned his entire tenure at Gurnee. In the case before us, however, we do not feel that the record before us has established that injunctive relief is necessary. Contrary to the situation in *EEOC v. Gurnee Inn Corp*, the Chicago Transit Authority does have in place both an anti–discriminatory policy and a formal grievance procedure for addressing complaints of discrimination. In addition, this case did not involve the complaints of a large number of employees. The record here, in so far as it goes, does not reveal the need to establish a process for dealing with allegations of discrimination. Rather, the facts seem to indicate that in this particular case the system in place simply did not work as it was intended. The record before us is not sufficient to establish the need for a broad

18

permanent injunction requiring the Defendant to institute system wide policies and procedures. The record contains no evidence that the CTA consistently fails to properly handle complaints of harassment or discrimination or that its procedures for handling such complaints are basically flawed or consistently ineffective.

## CONCLUSION

For the reasons set forth above, the CTA's motion for judgment notwithstanding the verdict is denied. The defendant's motion for new trial concerning liability is denied. However, the court hereby grants the motion for a new trial on the issue of damages only unless, within 21 days of the date hereof Plaintiff files a remittitur in the amount of $200,000.00 thereby agreeing to accept a reduced award of $100, 000. The totality of the circumstances supports a compensatory damage award of no more than $100,000. Finally, Plaintiff's motion for injunctive relief is denied.

SO ORDERED 9-6-01

ENTERED:

HON. RONALD A. GUZMAN
United States Judge